# United States District Court

SOUTHERN **DISTRICT OF** FLORIDA

UNITED STATES OF AMERICA

v.

JOSE MANUEL AVILES-TORRES
(a/k/a "Chaparro," a/k/a "Ramon"),

JAIME MORENO-ROMERO
(a/k/a "Efrain Diaz"), and

VICTOR AVILEZ-GARCIA
(a/k/a "El Negro").

## CRIMINAL COMPLAINT

Case No. 11-8214-LRJ

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about June 7, 2011, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant(s), (Track Statutory Language of Offense)

did knowingly and intentionally combine, conspire, confederate and agree with each other, and with other persons, to possess with intent to distribute a controlled substance, that is, five hundred (500) grams or more of a mixture and substance containing a detectable amount of cocaine, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B), all

in violation of Title  21  United States Code, Section(s)  846 .

I further state that I am a(n) Special Agent with United States Drug Enforcement Administration
Official Title
and that this complaint is based on the following facts:

(Please see attached affidavit.)

Continued on the attached and made a part hereof: [x] Yes [ ] No

Signature of Complainant
Special Agent Jean File-Aime
United States Drug Enforcement Administration

Sworn to before me, and subscribed in my presence,
upon my finding of probable cause.

June 8, 2011          at    West Palm Beach, Florida
Date                         City and State

UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer

Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF ARRESTS

Your affiant, Jean N. Fils-Aime, being duly sworn, does depose and state the following:

1. I am employed as a Special Agent of the U.S. Department of Justice, Drug Enforcement Administration (DEA.). I have been a Special Agent of the DEA since September of 2009. I am currently assigned to the West Palm Beach, Florida, Resident Office. Prior to becoming a Special Agent, I was employed as an Investigator at the Public Defender Office, 15th Judicial Circuit. During my tenure with DEA I have participated in investigations and been instructed in techniques dealing with the unlawful distribution of narcotics, possession with intent to distribute controlled substances, use of communication facilities to conduct narcotics transactions, and maintaining a place for purposes of manufacturing, distributing and using controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1), 843(b), 846, and 856.

2. As a Special Agent with the DEA, I have participated in numerous narcotics investigations, during the course of which I have conducted physical and wire surveillance, executed search warrants, and reviewed and analyzed taped conversations and records of drug traffickers. Through my training, education and experience, which has included debriefing cooperating drug traffickers, monitoring recorded conversations of drug traffickers, conducting searches of locations where drugs and money have been found, and conducting surveillance on individuals engaged in drug trafficking, I have become familiar with narcotics traffickers their methods of operation, including the manner in which illegal drugs are imported, transported, stored and distributed, the method of payment for such drugs, money laundering, and the efforts of persons involved in such activity to avoid detection by law enforcement. I am aware that drug traffickers

      often communicate with their drug trafficking associates through the use of cellular telephones. I am also aware that drug traffickers often speak in vague and/or coded language when discussing their illegal business in an effort to prevent detection.

3. The information contained in this affidavit is based upon my own personal knowledge, as well as information provided to me by other law enforcement officers and civilians. This affidavit is being submitted for the limited purpose of establishing probable cause for the arrest of Jose Manuel AVILES-TORRES (a/k/a "Chaparro," a/k/a "Ramon"), Jaime MORENO-ROMERO (a/k/a "Efrain DIAZ"), and Victor AVILEZ-Garcia (a/k/a "El Negro"). As such, this affidavit does not contain all the facts known to me relating to this investigation.

4. Events described in this affidavit occurred on or about the dates indicated, and all references to times are approximations only. The calls and meetings described herein took place in Spanish, and were translated to English with the assistance of bilingual law enforcement officers. Interpretations of the coded language utilized in the monitored and/or recorded conversations described in this affidavit are based upon my training and experience, as well as my overall knowledge of this investigation and conversations with the CS regarding the true meaning of the coded references.

**Background and Overview of the Investigation**

5. Since October of 2010, your affiant along with other DEA Special Agents and local law enforcement officers, have been involved in an investigation of the narcotics trafficking activities of the defendant, Jose Manuel AVILES-TORRES (a/k/a "Chaparro," a/k/a "Ramon"), who is believed to be responsible for the distribution of multi-kilogram quantities of cocaine on a weekly basis in and around Palm Beach County, Florida.

6. Based upon information obtained through multiple confidential sources of information, I believe: (1) that AVILES-TORRES is responsible for coordinating the importation of and eventual distribution of multi-kilogram quantities of cocaine from unidentified sources of supply; (2) that AVILES-TORRES utilizes couriers to transport cocaine from the Mexico/Texas border to the West Palm Beach area; (3) that AVILES-TORRES has numerous cocaine customers and that he utilizes street-level distributors to assist him with his narcotics trafficking activities; (4) that AVILES-TORRES utilizes stash houses for narcotics and other contraband; and (5) that AVILES-TORRES has been engaged in drug trafficking activities since at least as early as 2003.

7. At the direction of agents, a confidential source of information (CS) recently negotiated with AVILES-TORRES for the purchase of multiple kilograms of cocaine. The CS began working with law enforcement officers in 2010, and is being paid in exchange for his assistance in this investigation. The CS met AVILES-TORRES socially in 2005, and has provided information to the DEA regarding AVILES-TORRES's drug trafficking activities. Much of the information which the CS has provided has been independently corroborated, and the CS has never provided information later shown to be false. The CS has no known criminal history, and is believed to be reliable.

### CS Negotiations with AVILES-TORRES for the Purchase of Multiple Kilograms of Cocaine

8. On or about April 25, 2011, at the direction of law enforcement officers, the CS made contact with AVILES-TORRES at Taqueria Huetamo, a restaurant located at 1499 South Congress Avenue, in Delray Beach, Florida. The objective of the meeting was to ascertain whether the CS could broker a narcotics transaction between a fictitious large-

3

volume cocaine customer and AVILES-TORRES. The meet was not recorded, however the CS later reported to agents that AVILES-TORRES asked the CS about "work," which your affiant knows to be a common code word used by narcotics traffickers to refer to drug-related business. The CS advised AVILES-TORRES that the CS had a cousin who routinely traveled from North Carolina to whom the CS would provide 2 to 3 "paquetes" per week. "Paquetes" in English means "packages," and during this conversation the term was used as a coded reference to kilogram quantities of cocaine. AVILES-TORRES told the CS that he (AVILES-TORRES) could supply the CS's cousin with multiple kilograms of cocaine at $21,000.00 per kilogram. AVILES-TORRES offered to pay the CS $2,000 per kilogram of cocaine that AVILES-TORRES supplied to the CS's cousin. AVILES-TORRES provided the CS with his cellular telephone number.

9. On April 27, 2011, the CS placed a monitored and recorded call to AVILES-TORRES. During the call, the CS stated that his cousin liked the offered price because his cousin was getting it for "23" (referring to getting kilogram quantities of cocaine for $23,000 per kilogram).

10. On May 3, 2011, at 8:05 p.m., the CS placed another monitored and recorded telephone call to AVILES-TORRES. The CS requested to meet with AVILES-TORRES at the same restaurant (Taqueria Huetamo), and AVILES-TORRES agreed. The objective of the meeting was to negotiate the purchase of a sample of cocaine from AVILES-TORRES, in furtherance of ultimately completing the multi-kilogram deal. Following the telephone call, surveillance was immediately established outside the meet location. At 8:13 p.m., the CS entered the restaurant where he reportedly met with AVILES-TORRES. The meeting was audio recorded. The CS said that his/her cousin came from

the north and picked up "paquetes" (code for kilograms of cocaine) over the weekend. AVILES-TORRES asked from whom, and the CS replied that he/she did not know the source of supply. The CS asked AVILES-TORRES for a "sample" of cocaine to give to the CS's cousin. AVILES-TORRES stated that he could give the CS "una media o entera" (meaning a half or a full ounce of cocaine). AVILES-TORRES said that the CS's cousin would see that the odor and the color are good. The CS asked AVILES-TORRES if he (AVILES-TORRES) would be bringing the merchandise (kilograms of cocaine), and AVILES-TORRES replied that he could bring it or he could send someone to deliver it.

### AVILES-TORRES's Distribution of "Sample" Quantity of Cocaine to the CS on May 4, 2011

11. On May 4, 2011, at approximately 6:30 p.m., the CS placed a monitored and recorded telephone call to AVILES-TORRES. The CS and AVILES-TORRES agreed to meet at the same restaurant in Delray Beach later that day. The objective of the meeting was for the CS to purchase a sample of cocaine from AVILES-TORRES. Prior to the meeting, the CS met with agents at a predetermined location, where the CS and the CS's vehicle were searched for contraband, with negative results. The CS was also equipped with an audio recording device. Agents then surveilled the CS as he/she drove from the predetermined location to the restaurant. Surveillance was established outside the restaurant. At approximately 7:05 p.m., agents observed AVILES-TORRES arrive at the restaurant as a passenger in a Dodge minivan (the license plate of which was registered to a third party). The minivan was being driven by Victor AVILEZ-GARCIA. AVILES-TORRES was observed entering the restaurant with AVILEZ-GARCIA, where they

5

reportedly met with the CS.

12. A review of the recording from the May 4, 2011 meeting indicates that the CS greeted AVILES-TORRES, and then AVILES-TORRES directed the CS to the restaurant's bathroom. AVILEZ-GARCIA remained in the main area of the restaurant. Once inside the bathroom, AVILES-TORRES advised the CS that there are video cameras in the restaurant, but there were none inside the bathroom. AVILES-TORRES said, "Here, this is five points" (coded language for 5 grams of cocaine). This quantity of cocaine was provided to the CS free of charge. AVILES-TORRES then told the CS: "Convince your cousin to start working with us because the price is good." The two engaged in further conversation, negotiating the price for the CS's cousin.

13. Shortly thereafter, agents observed AVILES-TORRES and AVILEZ-GARCIA exit the restaurant and depart the area in the same minivan. Agents followed the CS from the restaurant to the same predetermined meet location. There, agents retrieved one clear Ziploc bag which the CS reported that he obtained from AVILES-TORRES during the meeting inside the restaurant. The bag contained a white powdery substance which field-tested positive for cocaine. The CS and his/her vehicle were then searched again for contraband, with negative results.

### Continued Negotiations between AVILES-TORRES and the CS for a Multi-Kilogram Cocaine Transaction

14. On May 10, 2011, the CS placed a monitored and recorded call to AVILES-TORRES to further negotiate the multi-kilogram cocaine transaction. During the conversation, AVILES-TORRES asked whether the CS's cousin had arrived from North Carolina, and the CS no, and that his cousin had "left loaded" (meaning that the cousin had returned to

North Carolina after his last trip to Florida with a substantial quantity of cocaine). AVILES-TORRES then told the CS to let AVILES-TORRES know when the CS's cousin returned, because AVILES-TORRES would be "ready."

15. On May 17, 2011, at 7:15 p.m., the CS placed a monitored and recorded telephone call to AVILES-TORRES. During the call, the CS advised AVILES-TORRES that the CS's cousin was in town and ready (indicating that the cousin was prepared to conduct the cocaine transaction). AVILES-TORRES replied that it would be better if they met in person. They agreed to meet at the same restaurant in Delray Beach. Surveillance was subsequently established at the Taqueria Huetamo. The CS was equipped with an audio recording device. AVILES-TORRES was observed arriving at the restaurant as a passenger in the same gold Dodge minivan observed at the previous meeting, driven by Victor AVILEZ-GARCIA. AVILEZ-GARCIA dropped AVILES-TORRES off at the restaurant and then departed the area.

16. The CS and AVILES-TORRES met inside in the restaurant at approximately 8:00 p.m. A review of the recording from the May 17, 2011 meeting indicates that AVILES-TORRES and the CS engaged in the following conversation: AVILES-TORRES stated "I will get that for you" (referring to kilograms of cocaine). AVILES-TORRES further told the CS to make sure the CS comes through because he did not want to "get stuck with all of that." Your affiant believes that with this statements, AVILES-TORRES was expressing concern that if the deal with the CS's cousin did not go through as planned, AVILES-TORRES would be left in possession of a large quantity of cocaine and no buyer. The CS assured AVILES-TORRES that everything was good. They planned to conduct the deal on the following day.

17. On May 18, 2011, AVILES-TORRES advised the CS that the deal would have to be delayed and no reason was given. Negotiations resumed thereafter, however. On May 30, 2011, the CS placed a monitored and recorded call to AVILES-TORRES. During the conversation, AVILES-TORRES stated that he wanted to make things right (indicating that he still intended to go through with the previously-planned cocaine transaction). AVILES-TORRES told the CS to let AVILES-TORRES know when the CS's cousin was coming back into town. On June 4, 2011, the CS placed a monitored and recorded call to AVILES-TORRES to advise AVILES-TORRES that the CS's cousin would be arriving a few days. Further, the CS advised AVILES-TORRES that his (CS) cousin wanted to know how many we had. AVILES-TORRES replied that he wanted to deal with four (referring to 4 kilograms of cocaine), just as they had agreed in previous conversations.

### Seizure of 4 Kilograms of Cocaine from AVILES-TORRES's Stash House on June 7, 2011

18. On June 6, 2011, the CS and AVILES-TORRES met at the Wendy's Restaurant located in Boynton Beach to continue negotiating the multi-kilogram cocaine transaction. During the recorded meeting, AVILES-TORRES told the CS that he had everything ready (referring to the 4 kilograms of cocaine). AVILES-TORRES further explained that since the deal did not go last time, AVILES-TORRES would reduce the price of "eso" (code for cocaine). AVILES-TORRES advised the CS that he [AVILES-TORRES] was storing "eso" at a residence in West Palm Beach, FL. AVILES-TORRES offered to allow the CS to inspect the cocaine at this residence, and even suggested that the CS could photograph it in order to show it the CS's cousin.

19. On June 7, 2011, the CS received a phone call from AVILES-TORRES. This call was

not monitored or recorded, however the CS immediately reported to agents the substance of the conversation. During the call, AVILES-TORRES stated that he was ready for the CS to come and see the cocaine (which AVILES –TORRES again referred to as "eso").

20. Later that day, on June 7, 2011, the CS met with agents at a prearranged location. The CS and CS's vehicle were searched for contraband with negative results. At approximately 10:55 A.M., the CS placed a monitored and recorded call to AVILES-TORRES, who instructed the CS to meet at a Wendy's restaurant located at 701 West Boynton Beach Blvd, just west of Interstate 95. The CS was equipped with a recording device and then was continuously surveilled as he drove to the meet location. Once at the restaurant, Agents observed AVILES-TORRES enter the passenger side of the CS's vehicle. The CS and AVILES-TORRES then departed traveling northbound on Interstate 95. Agents maintained continuous surveillance on the CS and AVILES-TORRES as they drove to a residence located at 1175 Mango Drive, West Palm Beach, FL, arriving there at approximately 12:13 P.M. AVILES-TORRES and the CS exited the vehicle and entered the residence. A short while later, the CS exited the residence alone, entered his vehicle, and drove back to a prearranged location to meet with agents. At that time, the CS provided agents with a sample of a white powdery substance which he stated he had obtained from AVILES-TORRES and others while inside the residence on Mango Drive. A field-test of the substance proved positive for the presence of cocaine.

21. The CS reported to agents that the following events transpired while he was inside the Mango Drive residence: Two Hispanic males were inside the residence when the CS and AVILES-TORRES arrived there. One was referred to as "El Negro" (later identified as Victor AVILES-GARCIA). The other was later identified as Jaime Moreno-Romero

9

(a/k/a "Efrain Diaz"). The residence was small and sparsely furnished. Once inside, AVILES-TORRES and AVILES-GARCIA went to the kitchen and together retrieved four rectangular bricks of cocaine from one of the cabinets. They placed the cocaine on top of a table located in the living room area of the residence. AVILES-TORRES told the CS to take a picture to show his cousin. AVILES-TORRES then asked for a knife so that the CS could take a sample from one of the bricks to provide to the CS's cousin. At that point, Jaime MORENO-ROMERO (a/k/a "Efrain Diaz") was lying on a mattress in the living room, just a few feet away from the table where the cocaine was sitting. MORENO-ROMERO, in a joking manner, told the CS that he should take a picture of the four bricks with all of them in the background. MORENO-ROMERO then handed AVILES-TORRES a knife. AVILES-TORRES used the knife to remove a small portion of cocaine from one of the kilogram bricks. AVILES-TORRES provided the sample to the CS and told the CS to take it to his cousin. The CS then left the residence and met agents at a prearranged location, where the CS turned over the sample of cocaine.

22. Agents maintained surveillance on the Mango Drive residence. At 2:05 p.m., they observed Victor AVILEZ-GARCIA leave the residence and drive away in a black four-door sedan. Subsequently, agents instructed the CS to return to the residence and attempt to have the four kilograms of cocaine fronted to the CS to take to the CS's cousin. At 2:42 p.m., the CS returned to Mango Drive, went inside, and exited shortly thereafter along with AVILES-TORRES and MORENO-ROMERO. While outside the residence, the CS placed a call to agents, however AVILES-TORRES believed that the CS was calling his cousin. The CS advised agents that AVILES-TORRES would not front the cocaine. Agents then observed AVILES-TORRES attempting to take the CS's cellular

10

telephone so that he could speak with the CS's cousin directly. At this point, agents responded to the residence and arrested AVILES-TORRES and ROMERO-MORENO. Immediately thereafter, agents entered the front door of the residence (which was then standing open) and conducted a protective sweep. Victor AVILEZ-TORRES was located and arrested later as a result of a traffic stop.

23. AVILES-TORRES and MORENO-ROMERO both signed written consent forms, authorizing agents to search the Mango Drive residence. During the search, agents seized four brick-shaped objects from the kitchen cabinet above the stove. A field test proved positive for the presence of cocaine.

### Post-Arrest Statements of the Defendants

24. AVILES-TORRES and MORENO-ROMERO were read their Miranda rights in Spanish. Both signed written waivers of their rights, and agreed to be interviewed by agents.

25. MORENO-ROMERO stated that he resided at the Mango Drive residence. MORENO-ROMERO further stated that an uncharged third party offered to pay him $2,000 to use the Mango Drive residence to store cocaine. The uncharged third party told MORENO-ROMERO that "CHAPARRO" (nickname for AVILES-TORRES) would later sell the cocaine from the Mango Drive residence. MORENO-ROMERO stated that he accepted the offer because he did not have a job and he needed the money to pay the rent. MORENO-ROMERO stated that AVILEZ-TORRES and "EL NEGRO" (nickname for AVILEZ-GARCIA) arrived at MORENO-ROMERO's residence the preceding night to prepare the cocaine for distribution. MORENO-ROMERO stated that AVILES-TORRES and MORENO-ROMERO left four bricks packaged for sale on top of a table located in the living room area. MORENO-ROMERO stated that AVILES-TORRES

11

ordered AVILEZ-GARCIA to stay at the Mango Drive residence overnight in order to guard the four bricks. MORENO-ROMERO stated that AVILEZ-GARCIA did stay overnight, and slept on the floor.

26. AVILES-TORRES stated that an uncharged third party (the same person identified by MORENO-ROMERO) had agreed to front AVILES-TORRES the four kilograms of cocaine which was ultimately seized by DEA. AVILES-TORRES had instructed AVILEZ-GARCIA to retrieve the cocaine from this uncharged third party. AVILES-TORRES stated that he contacted a Hispanic male known to him as "Efrain Diaz" (Jaime MORENO-ROMERO) and offered him to pay him $2,000 to use the Mango Drive residence as a stash location for the kilograms. AVILES-TORRES stated that on June 6, 2011, AVILEZ-GARCIA delivered the cocaine to the Mango Drive residence. There, AVILES-TORRES, AVILEZ-GARCIA and MORENO-ROMERO prepared and packaged the cocaine for sale to the CS. AVILES-TORRES stated that he instructed AVILEZ-GARCIA to stay overnight at the Mango Drive residence to guard the cocaine. AVILES-TORRES stated that he had intended to sell the cocaine to the CS for $18,000 per kilogram.

### Additional Evidence Relating to AVILEZ-GARCIA's Involvement in the Conspiracy

27. On June 7, 2011, at approximately 5:49 p.m., Palm Beach County Sheriff's office deputies conducted a traffic stop on a gold Infinity after observing the vehicle run a red light. During the traffic stop the front seat passenger produced a fraudulent Mexican identification card and was consequently arrested. The passenger was later identified as Victor AVILEZ-GARCIA. He was then placed under arrest by DEA for his involvement

in the AVILES-TORRES drug trafficking organization.

28. AVILEZ-GARCIA was read his Miranda rights in Spanish. He signed a written waiver of his rights and agreed to be interviewed. During the interview, AVILEZ-GARCIA stated that he did not know the owner of the Mango Drive residence (MORENO-ROMERO). He further stated that he did not know AVILES-TORRES, and was not involved in the AVILES-TORRES drug trafficking organization.

29. AVILES-TORRES has been the subject of a DEA investigation for several months. During the course of the investigation, DEA agents identified a residence located on Purdy Lane, in West Palm Beach, as a stash house for cocaine. AVILEZ-GARCIA admitted during his post arrest interview that he resided at this residence on Purdy Lane. AVILEZ-GARCIA and AVILES-TORRES were both observed on surveillance at the Purdy Lane residence on numerous occasions. AVILEZ-TORRES was also observed on at least three occasions in or around April/May of 2011 engaging in what appeared to be hand to hand drug transactions with unknown third parties. On these occasions, agents observed AVILEZ-GARCIA depart the Purdy Lane residence, drive to nearby locations (public parking lots), and engage in brief meetings with unknown people.

30. Your affiant maintains that the above-described facts establish probable cause to believe that on or June 7, 2011, the defendants, Jose Manuel AVILES-TORRES (a/k/a "Chaparro," a/k/a "Ramon"), Jaime MORENO-ROMERO (a/k/a "Efrain Diaz"), and Victor AVILEZ-GARCIA (a/k/a "El Negro"), did knowingly and intentionally conspire to possess with intent to distribute cocaine, in violation of Title 21, United States Code, Section 846.

**FURTHER AFFIANT SAYETH NAUGHT**

Special Agent Jean N. Fils-Aime
Drug Enforcement Administration

Sworn and subscribed before me
this 8 day of June, 2011.

LINNEA R. JOHNSON
UNITED STATES MAGISTRATE JUDGE

14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 11-8214-LRJ

UNITED STATES OF AMERICA

vs.

JOSE MANUEL AVILES-TORRES
(a/k/a "Chaparro," a/k/a "Ramon"),

JAIME MORENO-ROMERO
(a/k/a "Efrain Diaz"), and

VICTOR AVILEZ-GARCIA
(a/k/a "El Negro"),

        Defendants.
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003?  _____ Yes  __X__ No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007?  _____ Yes  __X__ No

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

BY: _____
Kimberly Abel
Assitant United States Attorney
Florida Bar No. 0134015
500 S. Australian Avenue, Suite 400
West Palm Beach, FL 33401
Tel: (561) 820-8711
Fax: (561) 805-9846